UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                        :

SHIRLEY MILLER, *et al.*,           :
                                        :

                     Plaintiffs,     :                 15cv7563
                                        :

          -against-             :          <u>OPINION & ORDER</u>
                                        :

THE CITY OF NEW YORK,        :
                                        :

                     Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
WILLIAM H. PAULEY III, Senior United States District Judge:

         The City of New York (the "City") moves for summary judgment in this class

action brought by female New York City school crossing guards claiming violations of the Equal

Pay Act ("EPA"), New York State Human Rights Law ("SHRL"), and New York City Human

Rights Law ("CHRL"). For the reasons that follow, the City's motion for summary judgment is

granted.

BACKGROUND

         In October 2016, this Court, on consent, conditionally certified a collective action

on Plaintiffs' EPA claim and certified a class action on Plaintiffs' SHRL and CHRL claims.

(See Order, ECF No. 42 "Order".) Both classes were defined as female employees who are or

were employed as school crossing guards ("School Crossing Guards") from September 2012

through December 2016. (Order.) Approximately 1,600 School Crossing Guards opted into the

collective action, and the SHRL and CHRL classes consist of over 2,000 individuals. (See

Docket; Declaration of Aliza Balog, ECF No. 89 ("Balog Decl."), Ex. A ("Gender

Breakdown").)

School Crossing Guards work for the New York City Police Department ("NYPD"), and are tasked with managing the flow of children and their parents at intersections near schools. (See First Amended Complaint, ECF No. 30 ("FAC"), ¶¶ 586–587.) The School Crossing Guard Manual describes the purpose of a School Crossing Guard as "protect[ing] children at school crossings." (Balog Decl., Ex. R ("Crossing Guard Manual"), at 8.) School Crossing Guards regulate traffic in accord with traffic signals, stop traffic to allow children to cross, inform pedestrians how to contact the police, and make note of traffic violations that they observe. (Crossing Guard Manual, at 8.) They are not permitted to override traffic signals and are required to "[r]emain on [the] sidewalk near the curb when not directing children across the street." (Crossing Guard Manual, at 8 ("Regulate traffic only as necessary to escort children safely across the street.") (emphasis added); Balog Decl., Ex. S ("Crossing Guard Job Specifications").)

School Crossing Guards do not sit for a civil service examination or undergo psychological testing. (Defendant's Local Rule 56.1 Statement of Material Undisputed Facts, ECF No. 92 ("Def.'s 56.1 Statement"), ¶¶ 64, 69.) There is no educational requirement or need to possess a driver's license. (Def.'s 56.1 Statement ¶¶ 68–69.) They receive one week of training. (Def.'s 56.1 Statement ¶ 71; Balog Decl., Ex. U ("Crossing Guard Orientation Guide"), at 2.) While School Crossing Guards must be familiar with traffic regulations, they do not enforce them. (Def.'s 56.1 Statement ¶ 75; see Crossing Guard Manual, at 8 ("Be familiar with Traffic Regulations and Vehicle Traffic Laws.").) School Crossing Guards are not authorized to issue tickets and do not carry radios or electronic equipment. (Def.'s 56.1 Statement ¶¶ 87–88, 102–103.) They work a maximum of five hours per day and do not work nights, holidays, or

weekends.  (Def.'s 56.1 Statement ¶¶ 94, 96–98.)

The NYPD also employs traffic enforcement agents.  (See FAC ¶ 589.)  The crux of Plaintiffs' claims is that School Crossing Guards are paid less than Traffic Enforcement Agents Level II ("Traffic Enforcement Agents"), even though they claim to do substantially the same work.  (FAC ¶ 2–3.)

Traffic Enforcement Agents "enforce laws, rules and regulations relating to the movement, parking, stopping and standing of vehicles."  (Balog Decl., Ex. B ("TEA Job Duties"), at 1.)  Accordingly, Traffic Enforcement Agents direct traffic, prepare and issue paper and electronic summonses, testify at administrative hearings and in court, and operate radios and other electronic equipment.  (TEA Job Duties, at 1–2; see also Declaration of Joseph L. Ellis III, ECF No. 90 ("Ellis Decl."), at ¶¶ 6–7 ("In addition to enforcing laws, rules and regulations relating to the movement, parking, stopping, and standing of vehicles, Traffic Enforcement Agents Level II also direct and control traffic at assigned locations and maintain the efficient and safe flow of vehicles and pedestrians.").)

In contrast to School Crossing Guards, Traffic Enforcement Agents perform a variety of duties.  For example, Traffic Enforcement Agents may "pull traffic"—i.e., wave a car through a red light. (Balog Decl., Ex. F ("TEA Manual"), at 12.) [1]  And Traffic Enforcement Agents may be required to work nights, weekends, and holidays, and can be mandated to work overtime.  (Ellis Decl. ¶¶ 8–10.)  Unlike School Crossing Guards, Traffic Enforcement Agents

---

[1] Other parts of the School Crossing Guard Manual mention directing traffic.  (See Crossing Guard Manual, at 10.) Nevertheless, other evidence clearly demonstrates that School Crossing Guards are not permitted to override traffic signals.  (See Crossing Guard Manual, at 10 ("**NEVER** give permission for a driver to violate any Traffic Regulation or Posted Sign.") (emphasis original); Balog Decl., Ex. T ("Michelle Ferreira Depo."), at 38:10–13 (acknowledging that School Crossing Guards are "not regulating traffic.  They're working within the guidelines of the traffic signals around them.").)

are taught to "[s]tay in the intersection. Do not stand on the sidewalk." (TEA Manual, at 12; but see Certification of Mohammad Shahjahan in Opp. to Mot. for Summary Judgment, ECF No. 98 ("Shahjahan Cert."), at ¶ 7 (opining that Traffic Enforcement Agents stand in traffic only when necessary).)

The qualifications to be a Traffic Enforcement Agent are more rigorous than those for School Crossing Guards. First, a Traffic Enforcement Agent must have served as a Traffic Enforcement Agent Level I. To qualify as a Traffic Enforcement Agent Level I, an applicant must pass a written exam, psychological evaluation, medical screening, drug screening, background investigation, and physical fitness test. (See TEA Job Duties, at 4; Balog Decl. Ex. D ("Notice of Examination"), at 1–3.) A Traffic Enforcement Agent Level I applicant must possess a four-year high school diploma and a valid driver's license. (TEA Job Duties, at 4.) A Traffic Enforcement Agent Level I receives ten to eleven weeks of training on topics including New York traffic laws, radio call signals and transmissions, hand signals, and field training. (Ellis Decl. ¶¶ 3–4; Def.'s 56.1 Statement ¶¶ 23–36.) When promoted to a Traffic Enforcement Agent Level II, an individual receives additional training on directing traffic. (Def.'s 56.1 Statement ¶ 51.)

At the time that this case was filed, Traffic Enforcement Agents received an annual salary ranging from $33,751 to $40,930 per year, which equates to approximately $16.16 to $19.60 per hour. (Balog Decl., Ex. H, at 4; Def.'s 56.1 Statement ¶ 40.) In contrast, School Crossing Guards were paid at an hourly rate ranging between $11.79 and $14.40 per hour. (Balog Decl., Ex. AA, at *3; Ex. W.) Compensation for Traffic Enforcement Agents and School Crossing Guards are set pursuant to separate collective bargaining agreements. (See Balog

Decl., Exs. G–H, W–Z.)  Approximately 44% of Traffic Enforcement Agents are female, while 56% are male.  (Gender Breakdown.)  Approximately 96% of School Crossing Guards are female, while 4% are male.  (Gender Breakdown.)

LEGAL STANDARD

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  However, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation and alterations omitted).  Indeed, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.

DISCUSSION

I.    Equal Pay Act

"The Equal Pay Act . . . prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and

which are performed under similar working conditions.'" <u>Belfi v. Prendergast</u>, 191 F.3d 129, 135 (2d Cir. 1999) (quoting 29 U.S.C. § 206(d)(1)). "The purpose behind the enactment of the EPA [is] to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work." <u>Belfi</u>, 191 F.3d at 135; <u>see also</u> <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 195 (1974) (Congress's goal was "to require that equal work will be rewarded by equal wages") (internal citation omitted).

To establish a violation of the EPA, a plaintiff must first come forward with a <u>prima facie</u> case that "(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort and responsibility; and (3) the jobs are performed under similar working conditions." <u>E.E.O.C. v. Port Auth. of N.Y. & N.J.</u>, 768 F.3d 247, 254–55 (2d Cir. 2014) (internal citation and alterations omitted). A plaintiff need not show discriminatory intent. <u>Belfi</u>, 191 F.3d at 136.

"While the equal work inquiry does not demand evidence that a plaintiff's job is 'identical' to a higher-paid position, the standard is nonetheless demanding, requiring evidence that the jobs compared are 'substantially equal.'" <u>Port Auth.</u>, 768 F.3d at 255; <u>see also</u> <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1310 (2d Cir. 1995), <u>abrogated on other grounds by</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998) ("[J]obs which are 'merely comparable' are insufficient to satisfy a plaintiff's prima facie burden."); 29 C.F.R. § 1620.14(a). In fact, "Congress rejected statutory language encompassing 'comparable work' to instead mandate equal pay for 'equal work.'" <u>Port Auth.</u>, 768 F.3d at 254 (internal citation omitted).

Although determining whether two positions are "substantially equal" is a question of fact, <u>Lavin-McEleney v. Marist College</u>, 239 F.3d 476, 480 (2d Cir. 2001), when a

plaintiff fails to proffer sufficient evidence for a reasonable jury to make such a finding,
summary judgment is appropriate.  See Chepak v. N.Y.C. Health & Hosps. Corp., 2015 WL
509279, at *8 (S.D.N.Y. Feb. 5, 2015); Guglielmo v. Marchon Eyewear, Inc., 2006 WL 398617,
at *8 (E.D.N.Y. Feb. 16, 2006) (proper consideration is whether "plaintiff has produced enough
evidence that a reasonable jury could find that the jobs were 'substantially equal'") (internal
citation omitted).

Equal Employment Opportunity Commission ("EEOC") regulations provide that
"[a]pplication of the equal pay standard is not dependent on job classifications or titles but
depends rather on actual job requirements and performance."  29 C.F.R. § 1620.13(e); see also
Port Auth., 768 F.3d at 256 ("[A] successful EPA claim depends on the comparison of actual job
content; broad generalizations drawn from job titles, classifications, or divisions . . . cannot
suffice.").  Nonetheless, "job descriptions are evidence—often exceedingly good evidence—of
actual job content."  Chepak, 2015 WL 509279, at *8 (internal citation and quotation marks
omitted).

EEOC regulations also explain the relevant criteria in determining whether two
jobs are "substantially equal"—the "skill, effort, responsibility, and similar working conditions"
referenced in the statute.  See 29 U.S.C. § 206(d)(1).  "Skill includes consideration of such
factors as experience, training, education, and ability."  29 C.F.R. § 1620.15(a).  "Effort is
concerned with the measurement of the physical or mental exertion needed for the performance
of a job [including] [j]ob factors which cause mental fatigue and stress . . . ."  29 C.F.R.
§ 1620.16(a).  Responsibility refers to "the degree of accountability required in the performance
of the job, with emphasis on the importance of the job obligation."  29 C.F.R. § 1620.17(a).

Similar working conditions "encompasses two subfactors: surroundings and hazards. Surroundings measure the elements . . . regularly encountered by a worker, their intensity and frequency. Hazards take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause." 29 C.F.R. § 1620.18(a) (internal quotation marks omitted).

The stark differences in training, job requirements, and job responsibilities between Traffic Enforcement Agents and School Crossing Guards warrant summary judgment on the EPA claim. First, Traffic Enforcement Agents must possess a high school diploma and a valid driver's license, and must pass a civil service exam. (TEA Job Duties, at 4; Notice of Examination, at 1–3). School Crossing Guards are not required to meet any of those qualifications. (Def.'s 56.1 ¶¶ 63, 68.) Traffic Enforcement Agents receive nearly ten times more training than School Crossing Guards, strongly suggesting the two positions require divergent skill levels. (Compare Def.'s 56.1 Statement ¶¶ 23–26, with Def.'s 56.1 Statement ¶ 71.) See Drury v. Waterfront Media, Inc., 2007 WL 737486, at *3 (S.D.N.Y. Mar. 8, 2007) (plaintiff failed to show same skills as comparators based on comparators' higher level of training and different skill set); Am. Fed'n of State, Cty., & Mun. Emps., AFL-CIO (AFSCME) v. Cty. of Nassau, 799 F. Supp. 1370, 1415–16 (E.D.N.Y. 1992) (fire communication technicians who required five years of experience as volunteer firefighters had higher skill level than police communication technicians who required only two years of experience in radio communications).

Second, Traffic Enforcement Agents are full-time employees that can be required to work nights, weekends, and overtime. (Ellis Decl. ¶¶ 8–10.) By comparison, School Crossing

Guards are part-time employees who work no more than five hours per day, primarily during school hours.  (Def.'s 56.1 Statement ¶¶ 94, 96–98.)  Indeed, many School Crossing Guards testified that they applied for the position because it was part-time.  (See Defs' 56.1 Statement ¶ 95 (summarizing deposition testimony).)  See Chiaramonte v. Animal Med. Ctr., 2016 WL 299026, at *12 (S.D.N.Y. Jan. 22, 2016) (comparator "saw at least ten patients a day" while plaintiff saw between three to six a day); accord Schultz v. Dep't of Workforce Dev., 752 F. Supp. 2d 1015, 1027 (W.D. Wis. 2010) (unequal effort because plaintiff "left the office at 3:15 p.m. every day" while comparator "was expected to be available to confer with [a supervisor] on a moment's notice, including nights and weekends").

Third, Traffic Enforcement Agents have more responsibility than School Crossing Guards.  They issue summonses and testify in court.  (See TEA Job Duties, at 1–2; Ellis Decl. ¶¶ 6–7.)  Moreover, while School Crossing Guards are taught to follow traffic signals, Traffic Enforcement Agents can override them.  (Compare TEA Manual, at 12, with Crossing Guard Manual, at 8.)  See AFSCME, 799 F. Supp. at 416 (while fire communication technicians performed "analogous tasks" to police communications operators, they provided other services, meaning they had more responsibility); see also Chiaramonte, 2016 WL 299026, at *11 ("[W]hile [p]laintiff and [her comparator] may have shared a few common responsibilities, no reasonable juror could find that their jobs were substantially equal given the differences in specialization, teaching responsibilities, and research.").

Fourth, aside from being outdoors, Traffic Enforcement Agents and School Crossing Guards do not work under similar conditions.  School Crossing Guards aid children and their parents at intersections near schools during school hours.  (Crossing Guard Manual, at 8.)

In contrast, Traffic Enforcement Agents direct and control traffic at locations throughout the City, including busy commercial intersections like Times Square, and may do so at night. (See February 23, 2018 Hr'g Tr., ECF No. 108, at 3:16–23.) School Crossing Guards stand in the middle of an intersection only when a traffic light is red and children need to cross. (Crossing Guard Manual, at 8.) Conversely, Traffic Enforcement Agents are stationed in the intersection when directing traffic. (TEA Manual, at 12.) That difference alone represents differing physical hazards. See Usery v. Columbia Univ., 568 F.2d 953, 961–62 (2d Cir. 1977) (exposure to crime from working late at night off of university premises constituted differing hazards encountered); Pfeiffer v. Lewis Cty., 308 F. Supp. 2d 88, 101 (N.D.N.Y. 2004) (female prison dispatcher encountered different hazards from male correction officers who "work[ed] directly with [] inmates in the cell blocks . . . whereas [plaintiff] works primarily in the secure control room").

Plaintiffs counter with the generalized observation that both School Crossing Guards and Traffic Enforcement Agents direct the flow of pedestrians and traffic. But that overly broad description ignores Second Circuit guidance that this Court must consider "actual job content." See Port Auth., 768 F.3d at 256–57 (plaintiff's argument that "an attorney is an attorney is an attorney" was unpersuasive because "broad generalizations based on mere job classifications are not cognizable under the EPA") (internal quotation marks omitted). Plaintiffs offer an affidavit from Mohammad Shahjahan, the secretary treasurer of the traffic enforcement agent union who offers his anecdotal observation that School Crossing Guards perform the "vast bulk of work done by [Traffic Enforcement Agents]." (Shahjahan Cert., ¶ 11.) And Plaintiffs' counsel submits a series of one- to two-minute video clips, most of which he recorded, showing School Crossing Guards and Traffic Enforcement Agents on duty. (See Supplemental

Declaration of Arthur Z. Schwartz, ECF No. 102.)

Neither the affidavit nor the video clips create a triable issue of fact. First, Plaintiffs' never disclosed this information during discovery, leaving the City with no opportunity to conduct a deposition or challenge the video clips. Second, the personal opinion of a traffic enforcement agent union official and approximately ten minutes of videos, taken at various locations and various times, do not legitimately counter the clear differences between School Crossing Guards and Traffic Enforcement Agents. For example, the video clips, selectively capturing a minute or two, say nothing about what those who were filmed were doing for the rest of the shift. Plaintiffs do not controvert the stark differences in training, education, hours worked, or responsibilities.

The fact that Traffic Enforcement Agents are occasionally assigned to School Crossing Guard posts is a matter of necessity required when School Crossing Guards do not report as scheduled for work. (See Declaration of Arthur Z. Schwartz Attaching Documentary Evidence, ECF No. 96, Exs. C–E.) As Traffic Manager Joseph Ellis III explained, Traffic Enforcement Agents are assigned to those posts temporarily, and then return to their assigned duties. (See Balog Decl., Ex. C, at 34:11–35:9, 36:21–37:25.)

"[S]ubstantial differences [in two positions], such as those customarily associated with differences in wage levels when the jobs are performed by persons of one sex only, will ordinarily demonstrate an inequality as between the jobs justifying differences in pay." 29 C.F.R. § 1620.14(a). Here, no reasonable juror could find an Equal Pay Act violation based on the substantial differences between a School Crossing Guard and Traffic Enforcement Agent.

II.	New York State Human Rights Claim

New York Executive Law § 296(1)(a) makes it "an unlawful discriminatory practice" for an employer to discriminate against an employee "in compensation or in terms, conditions or privileges of employment" based on the employee's sex. N.Y. Exec. Law. § 296(1)(a). Plaintiffs allege that the City discriminates against female School Crossing Guards by paying them less than male Traffic Enforcement Agents.

Discrimination claims under the SHRL are analyzed identically to claims brought under Title VII. See Smith v. Xerox Corp., 196 F.3d 358, 363 n.1 (2d Cir. 1999), overruled on other grounds by Meacham v. Knolls Atomic Power Lab, 361 F.3d 134, 140–41 (2d Cir. 2006) Title VII claims are analyzed under the burden-shifting framework of McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), which requires a plaintiff to establish a prima facie case of discrimination. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253–54 (1982). To establish a case of disparate pay under Title VII, a plaintiff must show: (1) she was a member of a protected class; (2) she was paid less than similarly situated non-members of her protected class; and (3) evidence of discriminatory animus. See Belfi, 191 F.3d at 139–140.

Plaintiffs' SHRL claim flounders on the second element—establishing that female School Crossing Guards and male Traffic Enforcement Agents are "similarly situated." A "plaintiff must show that she shared sufficient employment characteristics with [her] comparator so that they could be considered similarly situated." McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001) (internal citation omitted). "To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (internal citation omitted).

12

Put differently, "those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." McGuiness, 263 F.3d at 54. Whether two groups are "similarly situated" is a question of fact. However, "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 790–91 (2d Cir. 2007) (internal citation omitted).

The criteria to determine whether two positions are "similarly situated" mirror the factors considered under the EPA See Potash v. Fla. Union Free Sch. Dist., 972 F. Supp. 557, 580 (similarly situated factors "include similarities in education, seniority, performance, . . . specific work duties . . . and similar requirements for skill, effort, and responsibility for jobs performed 'under similar working conditions'").

Plaintiffs do not contend that they were paid less than male School Crossing Guards. Instead, they compare themselves to male Traffic Enforcement Agents. But all that Plaintiffs point to in arguing that these positions are "similarly situated" is that some work duties overlap. This ignores the myriad factors, such as education, training, job requirements, job responsibilities, hours worked, and similar working conditions, all of which need to be considered. This Court has already explained those differences above. In short, Traffic Enforcement Agents and School Crossing Guards are not similarly situated in all material respects to substantiate a SHRL claim. See Quarless v. Bronx–Lebanon Hosp. Ctr., 228 F. Supp. 2d 377, 384 (S.D.N.Y. 2002) (plaintiff's claim failed because he did not "account[t] for differences in education, seniority, performance, or specific work duties" between positions).

Accordingly, no reasonable jury could find that Plaintiffs establish a prima facie

case under the SHRL.  See Wynn v. N.Y.C. Hous. Auth., 2017 WL 933094, at *4 (S.D.N.Y. Mar. 8, 2017) (plaintiffs failed to make a prima facie case because they were "unskilled" and did not need to "take a qualifying exam prior to starting work," while comparators "were skilled [and] tested" before beginning their job); Chan v. N.Y. Univ. Downtown Hosp., 2006 WL 345853, at *3 (S.D.N.Y. Feb. 14, 2006) (plaintiff "has not identified similarly situated individuals outside of her protected class who were treated more favorably in terms of salary);" DeJesus v. Star Technical Risks Agency, Inc., 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004) (plaintiff was not similarly situated to comparator based on unequal education and job duties).

        Moreover, Plaintiffs' "claim would fail even if [there] were appropriate comparators because [they] ha[ve] provided no evidence of discriminatory intent."  Robinson v. Am. Int'l Grp., Inc., 2009 WL 3154312, at *4 (S.D.N.Y. Sept. 30, 2009).  School Crossing Guards and Traffic Enforcement Agents are compensated based on their separate collective bargaining agreements with the City.  (See Balog Decl., Exs. G, W.)  Plaintiffs point to no evidence that the pay rates reached in collective bargaining were based on gender.  And even if some inference could be made that School Crossing Guards are paid less because they are predominantly female, that conjecture is undercut by the fact that 44% of Traffic Enforcement Agents are also female.  (See Gender Breakdown.)  Those female Traffic Enforcement Agents receive the same amount of pay as male Traffic Enforcement Agents.  Any female School Crossing Guard with the proper credentials and education could apply to be a Traffic Enforcement Agent Level I and then secure a promotion to Traffic Enforcement Agent Level II. Plaintiffs' failure to offer any evidence of discriminatory animus is fatal to their SHRL claim.

III.    New York City Human Rights Claim

Under New York City law, an employer may not discriminate in terms of compensation based on an employee's gender.  N.Y.C. Admin. Code 8–107(a)(3).  The CHRL is given "an independent liberal construction," Loeffler v. Staten Island University Hospital, 582 F.3d 268, 278 (2d Cir. 2009) (internal citation omitted), in light of the statute's "uniquely broad and remedial purposes."  Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (internal citation omitted).  Thus, where "reasonably possible," a court must interpret a CHRL claim "in favor of discrimination plaintiffs."  Albunio v. City of N.Y., 947 N.E.2d 135, 137 (N.Y. 2011); see also Mihalik, 715 F.3d at 110 ("To establish a gender discrimination claim under the NYCHRL, the plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her gender.") (internal citation and quotation marks omitted).

But that generous reading is not an automatic green light—some minimum threshold must still be met.  See LeBlanc v. United Parcel Serv., 2014 WL 1407706, at *13 (S.D.N.Y. Apr. 11, 2014) ("The standard under the NYCHRL is liberal, but not boundless . . . ."); Gorman v. Covidien, LLC, 146 F. Supp. 3d 509, 532 (S.D.N.Y. 2015) ("[T]he NYCHRL does not alter the kind, quality, or nature of evidence that is necessary to support or defeat a motion for summary judgment . . . .") (internal citation omitted).

Here again, in order to succeed on their claim, Plaintiffs must "identify appropriate comparators and present a sufficiently developed record from which a jury could conclude that the comparators received preferential treatment."  Holleman v. Art Crating Inc., 2014 WL 4907732, at *45 (E.D.N.Y. Sept. 30, 2014); see also Shah v. Wilco Sys. Inc., 806

N.Y.S.2d 553, 559 (N.Y. App. Div. 2005) (for a CHRL disparate pay claim, a plaintiff must establish "that [s]he was paid less than similarly situated non-members of the class").  However, as previously noted, Plaintiffs cannot compare themselves to Traffic Enforcement Agents, as they are not similarly situated.  This is fatal to Plaintiffs' prima facie case.

Finally, Plaintiffs fail to offer any proof of discriminatory animus.  See Fenner v. News Corp., 2013 WL 6244156, at *13 (S.D.N.Y. Dec. 2, 2013) ("Under the NYCHRL's simplified inquiry, the plaintiff need only show that her employer treated her less well than other similarly situated employees, at least in part for discriminatory reasons.").  While this threshold is minimal, "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. . . . She must show that she has been treated less well at least in part because of her gender."  Mihalik, 715 F.3d at 110 (emphasis original, internal citation and quotation marks omitted).  A CHRL discrimination claim "fail[s] as a matter of law" if a plaintiff cannot show "that the conduct complained of was caused by a discriminatory motive, even in part."  Pena-Barrero v. City of N.Y., 2017 WL 1194477, at *15 (S.D.N.Y. Mar. 30, 2017) (internal citation and quotation marks omitted); see also Malanga v. N.Y. Univ. Langone Med. Ctr., 2017 WL 446612, at *3 (S.D.N.Y. Oct. 5, 2017).  There is no evidence in this record of a discriminatory motive underlying the disparate pay rates of School Crossing Guards and Traffic Enforcement Agents.

Perhaps realizing they cannot show discriminatory animus, Plaintiffs recast their CHRL claim as one of discriminatory impact.  "Disparate impact results from the use of employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on a protected group and cannot be justified by business necessity."

<u>Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.</u>, 964 F.2d 106, 115 (2d Cir. 1992)

(internal citation and alterations omitted). "To establish a <u>prima facie</u> case of disparate impact, a

plaintiff must show that a facially neutral employment policy or practice has a significant

disparate impact." <u>Brown v. Coach Stores, Inc.</u>, 163 F.3d 706, 712 (2d Cir. 1998).

But the First Amended Complaint never mentions discriminatory impact. It

alleges only that "Defendant [] discriminated against Plaintiffs and members of the class by

<u>treating them differently from and less preferably</u> than similarly-situated employees of the male

dominated [Traffic Enforcement Division]." (FAC ¶ 640 (emphasis added).) Indeed, plaintiffs

do not complain of any facially neutral employment practice that discriminates against women.

The pay disparity between Traffic Enforcement Agents and School Crossing Guards is <u>not</u>

facially neutral—the basis of Plaintiffs' claim is that female School Crossing Guards are <u>treated</u>

differently from male traffic enforcement agents because they are paid substantially less.

"The mere existence of a statistical imbalance between a covered entity's

challenged demographic composition and the general population is not alone sufficient to

establish a <u>prima facie</u> case of disparate impact violation unless . . . there is an identifiable policy

or practice or group of policies or practices that allegedly causes the imbalance." N.Y.C. Admin.

Code § 8–107(17)(b). Plaintiffs point to no such policy. Nor could they, given that 44% of

Traffic Enforcement Agents are female. (<u>See</u> Gender Breakdown.) And any female School

Crossing Guard who wants a full-time position with higher pay is free to apply to be a traffic

enforcement agent.

<u>CONCLUSION</u>

For the foregoing reasons, the City of New York's motion for summary judgment dismissing this action is granted. The Clerk of Court is directed to terminate all pending motions and mark this case as closed.

Dated: May 1, 2018
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.